**SAM P. ISRAEL P.C.**
Sam P. Israel, Esq. (SI0270)
Timothy L. Foster, Esq. (TF8896)
180 Maiden Lane, 6th Floor
New York, NY 10038
Tel:     (646) 787-9880
samisrael@spi-pc.com
timfoster@spi-pc.com
*Attorneys for Essex Global Trading, Inc.*


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
In re:

THE D & M CAPITAL GROUP, LLC,

      Debtor.
--------------------------------------------------------------------X
S.B. DIAMOND CORP.,

      Plaintiff,

    -against-

ESSEX GLOBAL TRADING, INC. and THE
D&M CAPITAL GROUP, LLC,

      Defendants.

--------------------------------------------------------------------X

Chapter 11

Case No. 19-11711 (SCC)

Adv. Pro. No.: 19-1332 (SCC)


## DEFENDANT ESSEX GLOBAL TRADING, INC.'S ANSWER AND CROSS-CLAIM

   Defendant Essex Global Trading, Inc. ("**Essex**" or the "**Defendant**"), by and

through its counsel, Sam P. Israel P.C., 180 Maiden Lane, 6th Floor, New York, New York

10038, as and for its answer to the Complaint of plaintiff S.B. Diamond Corp. ("**SBDC**"

or the ("**Plaintiff**"), and as and for its Cross-Claim against co-defendant and Chapter 11

debtor The D&M Capital Group, LLC ("**D&M**" or the "**Debtor**"), states as follows:

1.      Defendant states that Paragraph 1 of the Complaint sets forth legal conclusions as

to which no response is required and that any documents referenced in Paragraph 1 of

the Complaint speak for themselves and that as to those documents no response is

required, and the Defendant respectfully refers the Court to said documents for their full

terms, force and meaning; to the extent that a response is required, Defendant denies the

allegations set forth in Paragraph 1 of the Complaint.

2.      Defendant states that any documents referenced in Paragraph 2 of the Complaint

speak for themselves and that as to those documents no response is required, and the

Defendant respectfully refers the Court to said documents for their full terms, force and

meaning; to the extent that a response is required, Defendant denies the allegations set

forth in Paragraph 2 of the Complaint.

3.      Defendant states that any documents referenced in Paragraph 3 of the Complaint

speak for themselves and that as to those documents no response is required, and the

Defendant respectfully refers the Court to said documents for their full terms, force and

meaning; to the extent that a response is required, Defendant denies the allegations set

forth in Paragraph 3 of the Complaint.

4.      Defendant denies personal knowledge or information sufficient to form a belief as

to the truthfulness of the allegations set forth in Paragraph 4 of the Complaint regarding

the motivations of SBDC, and otherwise denies the allegations set forth in Paragraph 4 of

the Complaint.

5.      Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 5 of the Complaint.

6.      Defendant admits the allegations set forth in Paragraph 6 of the Complaint.

7.      Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 7 of the Complaint.

8.      Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 8 of the Complaint.

9.      Defendant states that Paragraph 9 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 9 of the Complaint.

10.      Defendant states that Paragraph 10 of the Complaint sets forth legal conclusions as to which no response is required.

11.      Defendant states that Paragraph 11 of the Complaint sets forth legal conclusions as to which no response is required.

12.      Defendant states that Paragraph 12 of the Complaint sets forth legal conclusions as to which no response is required.

13.      Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 13 of the Complaint.

14.      Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 14 of the Complaint.

15.      Defendant states that any documents referenced in Paragraph 15 of the Complaint speak for themselves and that as to those documents no response is required, and the

Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 15 of the Complaint.

16.    Defendant denies the allegations set forth in Paragraph 16 of the Complaint.

17.    Defendant states that any documents referenced in Paragraph 17 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 17 of the Complaint.

18.    Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 18 of the Complaint.

19.    Defendant denies the allegations set forth in Paragraph 19 of the Complaint.

20.    Defendant states that any documents referenced in Paragraph 20 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 20 of the Complaint.

21.    Defendant states that any documents referenced in Paragraph 21 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and

4

meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 21 of the Complaint.

22.     Defendant states that any documents referenced in Paragraph 22 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendant states that any documents referenced in Paragraph 23 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 23 of the Complaint.

24.     Defendant states that any documents referenced in Paragraph 24 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendant states that any documents referenced in Paragraph 25 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendant denies the allegations set forth in Paragraph 26 of the Complaint.

27.     Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 27 of the Complaint.

28.     Defendant states that any documents referenced in Paragraph 28 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 28 of the Complaint.

29.     Defendant states that any documents referenced in Paragraph 29 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendant respectfully refers the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendant states that any documents referenced in Paragraph 30 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 30 of the Complaint.

31.     Defendant states that any documents referenced in Paragraph 31 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and

meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 31 of the Complaint.

32.    Defendant states that any documents referenced in Paragraph 32 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 32 of the Complaint.

33.    Defendant states that any documents referenced in Paragraph 33 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and meaning.

34.    Defendant denies the allegations set forth in Paragraph 34 of the Complaint.

35.    Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 35 of the Complaint, but states affirmatively that the docket of the Court indicates that May 28, 2019 was the date of a voluntary filing for bankruptcy relief under Chapter 11 by the Debtor.

36.    Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 36 of the Complaint.

37.    Defendant states that any documents referenced in Paragraph 37 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies personal knowledge

7

or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 37 of the Complaint.

38.     Defendant states that any documents referenced in Paragraph 38 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 38 of the Complaint.

39.     Defendant admits the allegations set forth in Paragraph 39 of the Complaint.

40.     Defendant repeats, realleges, and incorporates by reference each and every one of its responses to Paragraphs 1 through 39 of the Complaint.

41.     Defendant states that Paragraph 41 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 41 of the Complaint.

42.     Defendant states that Paragraph 42 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 42 of the Complaint.

43.     Defendant states that any documents referenced in Paragraph 43 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 43 of the Complaint.

8

44.      Defendant states that Paragraph 44 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant admits that "the Debtor has no legal, equitable, ownership, or economic interest in the Ruby," admits that "the Ruby is not property of the bankruptcy estate," and denies all other allegations set forth in Paragraph 44 of the Complaint.

45.      Defendant states that Paragraph 45 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 45 of the Complaint.

46.      Defendant states that Paragraph 46 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 46 of the Complaint.

47.      Defendant repeats, realleges, and incorporates by reference each and every one of its responses to Paragraphs 1 through 46 of the Complaint.

48.      Defendant states that Paragraph 48 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 48 of the Complaint.

49.      Defendant states that any documents referenced in Paragraph 49 of the Complaint speak for themselves and that as to those documents no response is required, and the Defendants respectfully refer the Court to said documents for their full terms, force and meaning; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 49 of the Complaint.

50.    Defendant states that Paragraph 50 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 50 of the Complaint and specifically denies that SBDC holds any "interest" in the Sapphire or the Diamond.

51.    Defendant states that Paragraph 51 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 51 of the Complaint.

52.    Defendant states that Paragraph 52 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 52 of the Complaint.

53.    Defendant repeats, realleges, and incorporates by reference each and every one of its responses to Paragraphs 1 through 52 of the Complaint.

54.    Defendant denies the allegations set forth in Paragraph 54 of the Complaint.

55.    Defendant denies the allegations set forth in Paragraph 55 of the Complaint.

56.    Defendant admits the allegations set forth in Paragraph 56 of the Complaint, and specifically denies that the Defendant has any obligation to comply with such demands from SBDC.

57.    Defendant states that Paragraph 57 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 57 of the Complaint.

10

58.    Defendant states that Paragraph 58 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 58 of the Complaint.

59.    Defendant repeats, realleges, and incorporates by reference each and every one of its responses to Paragraphs 1 through 58 of the Complaint.

60.    Defendant denies the allegations set forth in Paragraph 60 of the Complaint.

61.    Defendant denies the allegations set forth in Paragraph 61 of the Complaint.

62.    Defendant admits the allegations set forth in Paragraph 62 of the Complaint.

63.    Defendant states that Paragraph 63 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 63 of the Complaint.

64.    Defendant denies the allegations set forth in Paragraph 64 of the Complaint.

65.    Defendant denies the allegations set forth in Paragraph 65 of the Complaint.

66.    Defendant repeats, realleges, and incorporates by reference each and every one of its responses to Paragraphs 1 through 65 of the Complaint.

67.    Defendant denies personal knowledge or information sufficient to form a belief as to the truthfulness of the allegations set forth in Paragraph 67 of the Complaint regarding what SBDC "seeks" and specifically denies that SBDC is entitled to the requested relief, or to any relief whatsoever.

68.    Defendant states that Paragraph 68 of the Complaint sets forth legal conclusions as to which no response is required.

69.     Defendant states that Paragraph 69 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 69 of the Complaint.

70.     Defendant states that Paragraph 70 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 70 of the Complaint.

71.     Defendant states that Paragraph 71 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 71 of the Complaint.

72.     Defendant states that Paragraph 72 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 72 of the Complaint.

73.     Defendant states that Paragraph 73 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 73 of the Complaint.

74.     Defendant states that Paragraph 74 of the Complaint sets forth legal conclusions as to which no response is required; to the extent that a response is required, Defendant denies the allegations set forth in Paragraph 74 of the Complaint.

75.     Defendant denies that the Plaintiff is entitled to judgment in its favor or for any relief whatsoever, including the relief requested in Paragraphs (a) through (f) of the prayer for relief contained in the "Wherefore" clause of the Complaint.

76.     Defendant denies each and every allegation in the Complaint not otherwise expressly addressed herein.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim, in whole or in part, upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred by the doctrines of laches, waiver, and estoppel, and by other equitable doctrines.

### THIRD AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred due to the Plaintiff's own misconduct.

### FOURTH AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred because the Plaintiff has no valid ownership rights in the property at issue, and therefore has no standing to sue.

### FIFTH AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred by the doctrine of unclean hands.

### SIXTH AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred by the doctrine of accord and satisfaction.

### SEVENTH AFFIRMATIVE DEFENSE

Essex is entitled to indemnification by the Debtor for any judgment, award, or other relief rendered in favor of SBDC and against Essex.

### EIGHTH AFFIRMATIVE DEFENSE

The relief requested in the Complaint is barred because Essex is a Buyer in Due Course of the property at issue.

13

## RESERVATION OF RIGHTS

The Defendant reserves the right to assert any additional and further defenses as may be revealed by discovery or otherwise.

## PRAYER FOR RELIEF

*WHEREFORE*, the Defendant respectfully requests that this Court enter a judgment granting the following relief:

1) That the Complaint be dismissed with prejudice;
2) That the Defendant be awarded attorney's fees, costs and applicable interest; and
3) Whatever other and further relief the Court deems just and proper.

## CROSS-CLAIM AGAINST THE D&M CAPITAL GROUP, LLC

1.     This is an action by defendant/cross-claim plaintiff Essex Global Trading, Inc. ("**Essex**" or the "**Cross-Claim Plaintiff**"), against defendant/debtor/cross-claim defendant The D&M Capital Group, LLC ("**D&M**" or the "**Cross-Claim Defendant**") for indemnification as to any judgment, liability, award, or other relief leveled against Essex on the claims asserted by plaintiff S.B. Diamond Corp. ("**SBDC**" or the "**Plaintiff**") in its adversary proceeding complaint (the "**Complaint**") against Essex and D&M, by reason of the property at issue being provided to Essex by D&M as security on a loan as to which D&M not only defaulted, but then affirmatively declared that Essex should retain the gems in satisfaction of the debt.

14

## THE PARTIES

2.      On information and belief, Cross-Claim Defendant D&M is a corporation organized under the laws of the State of New York, with offices at 592 Fifth Avenue, New York, New York.

3.      Cross-Claim Plaintiff Essex is a corporation organized under the laws of the State of New York,  with its principal place of business at 580 Fifth Avenue, 21st Floor, New York, New York.

## JURISDICTION

4.      This Court has jurisdiction over the Cross-Claims to the extent that it has jurisdiction over the claims in the Complaint, pursuant to  28 U.S.C. § 1334(b).

## FACTS

### The Gemstones in Dispute Were Loan Collateral and Belong to Essex

5.      As suggested in the Complaint, at issue in this adversary proceeding are three precious gemstones and pieces of fine jewelry, collectively characterized in the Complaint as the "**Gemstones**" — a Kashmir sapphire, a Burmese ruby, and a diamond.

6.      Upon information and belief, the sapphire described in the complaint and defined as the "Sapphire" is the same stone at issue in the Adversary Proceeding brought by D&M against Essex (*see The D&M Capital Group, LLC v. Essex Global Trading, LLC, et al.,* Adv. Proc. No. 19-1300 (the "**D&M Adversary Proceeding**") and characterized in the D&M Adversary Proceeding as a ring containing a 23.38 carat Kashmir sapphire, listed elsewhere as "Class JR0182 – One PL Ring with 23.38 CTS, KASHMIR SAPPHIRE WITH

(2) BLTS 0.89 AND 0.83 CTS JR0182" and known as the "**Kashmir Sapphire**" or "**Item JR0182.**"

7.      Upon information and belief, the ruby described in the Complaint and defined as the "Ruby" is the same stone at issue in the D&M Adversary Proceeding and characterized therein as a ring containing a 7.02 carat ruby listed as "Item No. JR0306, Platinum Ring with Ruby 7.02 CT surrounded by 8 OV 3.43 CT with Micro Pave on Shank 35 CT" and known as the "**Ruby Ring**" or "**Item JR0306.**"

8.      Upon information and belief, the diamond described in the Complaint and defined as the "Diamond" is the same stone at issue in the D&M Adversary Proceeding and characterized therein as a ring containing a yellow diamond listed as "Item No. JR0280 – YG Diamond Ring with SE 10 02CT FVY VS2 Set with FYI Melee 2 15 CT TW" and known as the "**Yellow Diamond**" or "**Item JR 0280.**"

9.      Each of the Gemstones was provided to Essex by D&M as collateral for, and eventually in repayment and satisfaction of, monetary loans made by Essex to D&M at D&M's request.

10.     At all relevant times, up to the filing of D&M's petition for Chapter 11 bankruptcy protection, D&M represented to Essex that D&M was the sole owner of a 100% interest in each of the Gemstones.

11.     At all relevant times, up to the filing of D&M's petition for Chapter 11 bankruptcy protection, Essex had no knowledge that SBDC claimed to possess any interest in any of the Gemstones.

16

**Essex Extends The First Secured Monetary Loan to D&M**

12.     Essex and D&M are both in the business of buying and selling fine jewelry and precious gemstones.

13.     Essex and D&M have a lengthy history of business dealings with one another.

14.     In mid-2012, Moty Spector ("**Spector**"), the principal of D&M, contacted Aleks Paul ("**Paul**"), the principal of Essex, and requested that Essex issue a monetary loan to D&M.

15.     Upon information and belief, Spector and D&M were required to seek funding through a familiar business partner such as Essex, because Spector and D&M have difficulties obtaining credit through traditional financial institutions, due in part to Spector's poor reputation in the industry.

16.     Upon information and belief, Spector's poor reputation is due in part to his involvement in an infamous bribery scandal in 2005, in which Spector and his former business, Vivid Collection LLC, were accused of bribing laboratory certifiers at the Gemological Institute of America (the "**GIA**") to inflate the certified grading, and therefore the value, for certain gemstones submitted by Spector to the GIA for testing and grading.

17.     Upon information and belief, as a result of legal action stemming from the scandal involving the GIA, Spector's authority to trade in diamonds is restricted or eliminated.

18.     Through a series of wire transfers and checks, beginning with a wire transfer of $1,000,000.00 on or around August 31, 2012, Essex made a loan to D&M which was intended to be for the total amount of $8,000,000.00 (the "**First Loan**").

17

19.     The funding of the First Loan from Essex to D&M included a check dated November 1, 2012 in the amount of $3,500,000.00, a check dated January 16, 2013 in the amount of $1,385,000.00, a check dated February 8, 2013 in the amount of $1,000,000.00, and a number of other checks and wire transfers issued to D&M.

20.     In order to provide the requested loan to D&M, Essex was required to seek out and itself borrow a portion of the funds from other sources. Thus, Essex incurred its own debt in order to help D&M by furnishing the First Loan.

21.     As of June 11, 2013, the outstanding principal of the First Loan owed by D&M was $8,000,000.00.

22.     In December of 2013, the balance of the principal of the First Loan rose as high as $10,500,000.00 when Essex issued to D&M a check dated December 17, 2013 in the amount of $2,180,000.00.

23.     In April and June of 2014, D&M made significant repayments on the First Loan to bring the outstanding balance of principal on the First Loan to $8,000,000.00 as of June 20, 2014.

24.     From the beginning, and at all relevant times, the agreement and practice of Essex and D&M was to secure the loans made to D&M, using certain precious gemstones and jewelry in D&M's inventory as collateral assigned to Essex.

25.     D&M repeatedly recorded this collateral in "Memos" assigning gemstones to Essex. Upon information and belief, D&M issued a Memo every time it transferred or received the return of a piece of inventory.

18

26.     In these Memos, D&M consistently assigned wildly inflated and inaccurate values for the collateral inventory.

27.     For example, a "Memo" Number 3610, issued by D&M and dated April 23, 2013, describes a certain 102.88 carat diamond transferred to Essex and states that the gem is "For the purpose of colatarol [*sic*] for loan for D&M 7.5 million."

28.     The "Amount" listed by D&M on Memo No. 3610 for the diamond described therein is $18,000,000.00.

29.     Memo Number 3646, issued by D&M and dated June 17, 2013, lists the "Ocean Dream" ring provided "for purpose of collateral only against $8 million dollar loan from Essex to DM."

30.     The "Amount" listed by D&M on Memo No. 3646 for the diamond described therein is $22,000,000.00.

31.     Memo Number 3610 and Memo Number 3646 reflect collateral for the same loan, for which the outstanding principal increased from $7,500,000.00 to $8,000,000.00 between April 23, 2013 and June 17, 2013 by virtue of a check issued from Essex to D&M on June 11, 2013 in the amount of $500,000.00.

32.     The "Amounts" assigned by D&M to the gems listed in Memo No. 3610 and Memo No. 3646 are greatly overstated and do not reflect the actual value of the gems listed therein.

33.     Memo Number 4215, issued by D&M and dated June 11, 2015, lists a total of five pieces and states that those pieces are "for collateral only against loan of $5 million" (the outstanding balance of the First Loan as of that date).

34.     Memo Number 4269, issued by D&M and dated October 20, 2015, names and describes Item JR0182—the Kashmir Sapphire at issue in the instant proceeding.

35.     Memo Number 4269 states that the Kashmir Sapphire is offered as "Collateral for loan" in connection with the First Loan.

36.     Memo Number 4277, issued by D&M and dated November 3, 2015, lists a diamond necklace provided "for collateral against loan of $8,500,000.00" and with an "Amount" claimed by D&M to be $12,500,000.00.

37.     Memo Number 4293, issued by D&M and dated November 24, 2015, lists a pair of "Harry Winston" earrings with an "Amount" claimed by D&M to be $3,500,000.00, and the Kashmir Sapphire, both provided to Essex "for collateral against loan of $8,500,000.00."

38.     Memo Number 4374, issued by D&M and dated April 21, 2016, lists a pair of diamond earrings, a diamond necklace, the Kashmir Sapphire, and a diamond ring, all provided to Essex "as collateral against loan of 9.5 million loan."

39.     Memo Number 4456, issued by D&M and dated August 2, 2016, again describes the Kashmir Sapphire, as "COLLATERAL ONLY."

40.     Memo Number 4488, issued by D&M and dated September 27, 2016, lists a pair of "Harry Winston" earrings, the Kashmir Sapphire, and a diamond (known in the D&M Adversary Proceeding as the "Pink Diamond") all provided to Essex "for collateral loan of $8,500,000."

41.     Memo Number 4608, issued by D&M and dated March 1, 2017, depicts a ring with a 28.59-carat Burma ruby given an "Amount" by D&M of $6,000,000.00, and a ring with

a 25.33 diamond with an "Amount" claimed by D&M to be $5,000,000.00, both "for collateral only."

42.    Each of the Memos conveying a security interest for the First Loan, including Memo Nos. 3610, 3646, 4215, 4269, 4277, 4293, 4374, 4456, 4488, and 4608 (collectively, the "**First Loan Collateral Memos**") were issued on the same "Memo" form used by D&M up to and including the present, including on the Memos defined in the D&M Adversary Proceeding as the "Essex Memos," and each contains the same language defined in the D&M Adversary Proceeding as the "Consignment Terms":

> The merchandise described above is delivered to you on memorandum, at your risk from all hazards, regardless of the cause for the loss or damage, only for examination and inspection, upon express condition that all such merchandise shall remain the property of D&M Capital Group, LLC and shall be returned on demand, in full in its original form. Until the merchandise is returned and actually received by us, you are fully responsible therefor, and in the event of damage or loss for whatever reason, whether caused by you or another, whether or not under your control, you will indemnify us immediately by payment of the amount in the column Amount (US$) above which represents the extent of the actual loss and is not intended to constitute a price of the sale of the merchandise. You acquire no right of authority to sell, pledge, hypothecate, or otherwise dispose of the merchandise, or any part thereof by memorandum or otherwise. It being expressly understood that regardless of other transactions or prior trade customs, no credit is extended with respect to this memorandum. A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received a separate invoice. Receipt of the merchandise constitutes your agreement to the foregoing terms which represent the entire contract with respect to the merchandise herein described and which cannot be varied by oral statements, dealings with respect to other merchandise or any contrary customs of the trade. You consent to the personal jurisdiction of the Federal State Court in the City and State of

21

New York in any lawsuit arising out of the consignment or any sale resulting therefrom. Any such lawsuits between us are may only be brought in one of such courts. Each of us consents to service of process by certified mail, return receipt requested.

43.    The added notations on the First Loan Collateral Memos, as well as on any other similar Memos, that the property described therein was offered as collateral for a loan, supersede and negate the Consignment Terms on the forms.

44.    In fact, the so-called consignment language was invariably no moment to the nature of the parties' underlying arrangements but was meant to merely denote who had custody of the underlying gems at the time.

45.    The added notations on the First Loan Collateral Memos, as well as on any other similar Memos, that the property described therein was offered as collateral for a loan, grant security interests in those gems to Essex in connection with the named loan.

46.    D&M intended and agreed to, and indeed did, grant security interests in the collateral gems to Essex in connection with the First Loan.

47.    Essex would not have extended the requested credit to D&M for the First Loan without adequate security for the debt, and Essex acted in reliance upon D&M's commitment to provide sufficient collateral for the First Loan at all relevant times.

48.    On or around June 27, 2017, the balance of the First Loan was reduced to zero after D&M provided a valuable jewelry item to Essex in satisfaction of the debt, consistent with D&M's practice of giving Essex inventory pieces instead of money to cover its loan payments.

**Essex Provides the Second Secured Monetary Loan to D&M**

49.     Shortly after the elimination of the First Loan, Spector approached Essex and Paul

in late June of 2017 and requested that Essex issue additional credit to D&M, again

offering various inventory pieces as security.

50.     Essex granted Spector's request and in July 2017 extended a secured loan to D&M

of the total principal amount of $5,500,000.00, which was later increased to a principal

amount of $6,500,000.00 in November 2017  (the "**Second Loan**").

51.     As with the First Loan, Essex was required to again borrow a portion of the needed

funds from other sources. Thus, Essex incurred its own debt in order to help D&M by

furnishing the Second Loan.

52.     D&M issued numerous Memos reflecting Essex's interests in collateral for the

Second Loan.

53.     For example, Memo Number 4736, issued by D&M and dated July 25, 2017, shows

a ring with a 28.59-carat Burma ruby, Item No. JR0250 (the same ring reflected in Memo

No. 4608) given an "Amount" by D&M of $6,000,000.00, "as collateral for $5.5M Loan."

54.     The notation in Memo No. 4736 states further that the collateral is a "ring owned

100% by D&M Capital Group, LLC."

55.     Memo Number 4743, issued by D&M and dated July 27, 2017, shows the ruby ring

from Memo No. 4736 (JR0250), as well as the "Pink Diamond," and states that these pieces

are not only provided as "collateral for $5.5m loan," but are "100% owned by D and M

CApital [*sic*] Group, LLC."

23

56.     Memo Number 4856, issued by D&M and dated November 22, 2017, depicts the Kashmir Sapphire and certifies the gemstone as "100% owned by D and M Capital Group LLC" and provides that the item is "collateral for loan."

57.     According to its own filings, D&M never owned a 100% interest in the Kashmir Sapphire and, at most, owned a 34% interest in the item.

58.     D&M also alleges in the D&M Adversary Proceeeding  that the Kashmir Sapphire was originally purchased by D&M in 2008 for $1,850,000.00, far below the inflated value of $7,000,000.00 ascribed to it by D&M in the Memos.

59.     Memo Number 5072, issued by D&M and dated June 29, 2018, depicts the Pink Diamond and, in handwriting, notes that it is "collateral."

60.     Memo Number 5251, issued by D&M and dated February 28, 2019, describes the Pink Diamond,  a pair of earrings known in the D&M Adversary Proceeding as the "Emerald Earrings" (Item No. JE0104), a pendant known in the D&M Adversary Proceeding as the "Cross Pendant" (Item No. JP0105), the Yellow Diamond at issue in this action (Item JR0280), and a platinum ring, and provides them all "for collateral against 6.5m loan."

61.     Each of the Memos purporting to convey a security interest for the Second Loan, including Memo Nos. 4736, 4743, 4856, 5072, and 5251 (collectively, the "**Second Loan Collateral Memos**") were issued on the same "Memo" form used by D&M up to and including the present, including on the Memos defined in the D&M Adversary Proceeding as the "Essex Memos," and each contains the same language defined in the D&M Adversary Proceeding as the "Consignment Terms":

The merchandise described above is delivered to you on memorandum, at your risk from all hazards, regardless of the cause for the loss or damage, only for examination and inspection, upon express condition that all such merchandise shall remain the property of D&M Capital Group, LLC and shall be returned on demand, in full in its original form. Until the merchandise is returned and actually received by us, you are fully responsible therefor, and in the event of damage or loss for whatever reason, whether caused by you or another, whether or not under your control, you will indemnify us immediately by payment of the amount in the column Amount (US$) above which represents the extent of the actual loss and is not intended to constitute a price of the sale of the merchandise. You acquire no right of authority to sell, pledge, hypothecate, or otherwise dispose of the merchandise, or any part thereof by memorandum or otherwise. It being expressly understood that regardless of other transactions or prior trade customs, no credit is extended with respect to this memorandum. A sale of all or any portion of the merchandise shall occur only if and when we agree and you shall have received a separate invoice. Receipt of the merchandise constitutes your agreement to the foregoing terms which represent the entire contract with respect to the merchandise herein described and which cannot be varied by oral statements, dealings with respect to other merchandise or any contrary customs of the trade. You consent to the personal jurisdiction of the Federal State Court in the City and State of New York in any lawsuit arising out of the consignment or any sale resulting therefrom. Any such lawsuits between us are may only be brought in one of such courts. Each of us consents to service of process by certified mail, return receipt requested.

62.     The added notations on the Second Loan Collateral Memos, as well as on any other similar Memos, that the property described therein was offered as collateral for a loan, supersede and negate the Consignment Terms on the forms.

25

63.     The added notations on the Second Loan Collateral Memos, as well as on any other similar Memos, that the property described therein was offered as collateral for a loan, grant security interests in those gems to Essex in connection with the named loan.

64.     D&M intended and agreed to, and indeed did, grant security interests in the collateral gems, including the Gemstones, to Essex in connection with the Second Loan.

65.     Essex would not have extended the requested credit to D&M for the Second Loan without adequate security for the debt, and Essex acted in reliance upon D&M's commitment to provide sufficient collateral for the Second Loan at all relevant times.

**D&M Pays Down Its Debt by Giving Collateral Gems to Essex**

66.     As part of its agreements with Essex in connection with the First Loan and the Second Loan, in addition to its promises to repay the principal of those loans, D&M obligated itself to remit monthly payments of interest on the amount of principal debt.

67.     Not only did D&M have a long history of offering gemstones and jewelry as collateral for its debt to Essex, but it also had a history of paying down that debt or the monthly interest payments by transferring gemstones and jewelry to Essex.

68.     In numerous instances, D&M demanded that Essex accept inventory items in lieu of monetary payments, because D&M claimed that it lacked funds to pay its obligations.

69.     For example, Invoice No. 12140, issued by D&M and dated June 27, 2017, shows that Essex was given a necklace (Item No. JN0168) valued at $10,000,000.00, in exchange for crediting D&M with an "$8 million dollar loan repayment," three months' worth of past-due interest payments on the First Loan, and a $500,000.00 "deposit" on the Second Loan. This was the transaction that reduced the First Loan to a balance of zero.

70.     Numerous other invoices issued by D&M between 2013 and the present note that gems were given or sold to Essex for fair value exchanges of credits against interest payments or principal on the First Loan or the Second Loan.

71.     Invoice No. 11429, issued by D&M and dated July 3, 2013, purports to bill Essex $2,200,000.00 for a diamond necklace, minus a "Commission Expense" of $160,000.00, such that the total amount Essex was invoiced for its purchase of the necklace was $2,040,000.00. The $160,000 deducted from the original price was not, in fact, a "commission," but rather a remittance by D&M of its required interest payments on the First Loan in lieu of money.

72.     Invoice No. 11435, issued by D&M and dated August 21, 2013, purports to bill Essex $300,000.00 for a set of diamond earrings. At Spector's insistence, Essex paid only $140,000.00 to D&M by check for these earrings, and the balance was satisfied by deducting D&M's interest payments on the First Loan.

73.     Invoice No. 11601, issued by D&M and dated February 11, 2015, lists a diamond ring with a sale amount of $1,150,000.00 and a "Balance Due" of $0.00 after Credits/Payments of $1,150,000.00 were applied. These "Credits/Payments" included a $500,000.00 reduction in the principal balance of the First Loan, credit for two months' interest on the First Loan, and a check given to D&M by Essex in the amount of $330,000.00.

74.     Invoice 11601 also bears a notation that "The payment of $160,000 below is for the interest payment for January 2015."

75.     Invoice No. 11945, issued by D&M and dated February 1, 2016, purports to sell D&M's 50% share in an 8.91 carat oval diamond to Essex for a price of $300,000.00, but also notes that this $300,000.00 is "paid on account of 2 months interest of loan."

76.     Invoice No. 11983, issued by D&M and dated July 19, 2016 reports the sale to Essex of a necklace and earrings for a total list price of $2,200,000.00. In reality, Essex paid D&M only approximately $1,690,000.00 for these pieces, as the rest was offset, at the demand of Spector and D&M, by credits to Essex for several months of interest payments owed by D&M on the First Loan.

77.     Invoice No. 12090, issued by D&M and dated February 16, 2017, lists two diamonds sold to Essex for a total of $348,973.25, of which Essex only needed to submit a check for $178,973.25 because this invoice allowed for a "credit towards payment $170000.00 for interest."

78.     Similarly, Invoice No. 12116, issued by D&M and dated April 20, 2017, lists two diamonds sold to Essex for a total of $350,000.00, of which Essex actually paid only $190,000.00 because this invoice showed that a "credit of $160000.00 for March applied."

79.     Invoice No. 12327, issued by D&M and dated July 10, 2018, shows the sale to Essex of a diamond for the invoice price of $285,300.00, yet the invoice also shows that from that price was "deducted $235000.00 Jan and Feb interest" and "25000.00 towards March interest," such that the final Balance Due, and the amount actually remitted by Essex, for the diamond was $25,300.00.

80.     In all cases where a gemstone or piece of jewelry was substituted for a payment of interest or principal on the First Loan or the Second Loan, such substitution occurred at the behest or insistence of D&M and Spector.

81.     In or around 2015, Spector listed for sale an apartment that he owned personally. Spector requested of Paul that Essex take the apartment in satisfaction of the First Loan — offering Spector's personal asset to pay off the corporate debt of his company D&M. Essex declined this offer.

82.     In short, D&M and Spector had a lengthy history of using tangible property, primarily in the form of gemstones and fine jewelry, as substitutions for monetary payments on their debts to Essex.

83.     In July of 2018, D&M was several months in arrears on its monthly interest payments. D&M sent Essex a check, dated July 10, 2018, for $365,000.00 to cover the overdue amounts, but then D&M, through Spector, began discussions with Essex, through Paul, that ultimately resulted in an agreement that Essex could simply take full ownership of the collateral it currently held (including the Gemstones) and apply them against the ongoing debt.

84.     D&M's offer was consistent with its past practices, as it had repeatedly substituted the value of inventory pieces for monetary payments on both the First Loan and the Second Loan, and had paid off the principal of the First Loan by assigning valuable jewelry over to Essex.

85.     In acceptance of D&M's offer, Essex did not cash the check issued by D&M on July 10, 2018.

86.    D&M issued monthly payment checks to Essex on August 6, 2018, September 7, 2018, and October 1, 2018, all of which went untendered by Essex due to its new agreement with D&M to satisfy the debt with the collateral, including the Gemstones.

87.    D&M issued no monetary payments of any kind on the Second Loan after October 2018, and has not actually payed any monies to Essex against the Second Loan since approximately April 2018, as reflected in the uncashed checks.

88.    No later than November 2018, the agreement between Essex and D&M became final and active and Essex assumed full ownership of the collateral, including the Gemstones, in satisfaction of the Second Loan (including the past-due interest payments).

89.    As of November 2018, Essex maintained physical possession and full ownership in the Gemstones.

90.    Based upon the oral agreements made between D&M, through Spector, and Essex, Essex believed the debt to be satisfied and the ownership of the Gemstones to rest solely with Essex.

91.    At all relevant times, D&M represented that it was the sole owner of a 100% interest in any gems it offered to Essex as collateral for the First Loan or the Second Loan, including the Gemstones.

92.    At all relevant times, D&M represented to Essex that D&M was the sole owner of 100% interests in each of the Gemstones.

93.    At no time prior to the filing by D&M of its petition for Chapter 11 bankruptcy protection did Essex have or receive any evidence or knowledge that SBDC, or any party other than D&M, claimed an interest in any of the Gemstones.

94.    To the extent that D&M came into physical possession of some or all of the Gemstones after November 2018, it did so on consignment from Essex, and not as an owner of any of the Gemstones.

95.    Had the Second Loan not been satisfied through Essex's ownership of the collateral, including the Gemstones, D&M would be in default on the Second Loan for approximately eighteen months' worth of payments as of the filing date of these Cross-Claims.

96.    Based upon D&M's representations that Essex could retain ownership of the Gemstones in satisfaction of the Second Loan, Essex willingly went without payment of principal or interest in connection with the Second Loan from approximately April 2018 to the present.

97.    Accordingly, Essex is a buyer in the ordinary course of business of each of the Gemstones.

## COUNT I

## COMMON-LAW INDEMNIFICATION

98.    The Cross-Claim Plaintiff re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

99.    Essex lent money to D&M in good faith, based upon D&M's representations that its debt was secured by collateral owned exclusively by D&M.

100.    As of the time that D&M stopped making payments in connection with the Second Loan in 2018, the unpaid principal balance of the Second Loan was $6,500,000.00.

101.   Essex held possession of the Gemstones for significant lengths of time between 2015 and the present.

102.   The Memos issued by D&M reflect that the Gemstones were offered to Essex by D&M as security on D&M's debt in connection with the Second Loan.

103.   In mid-2018, D&M offered to give Essex the collateral, including the Gemstones, in satisfaction of the outstanding debt, and Essex accepted.

104.   From approximately April 2018 to the present, Essex has not taken in any monetary payments in connection with the Second Loan.

105.   Essex did not pursue D&M for payment on the Second Loan because it reasonably believed that the Second Loan was satisfied by its retention of ownership of the Gemstones.

106.   As of November 2018, Essex maintained physical possession and full ownership in the Gemstones.

107.   Based upon the oral agreements made between D&M, through Spector, and Essex, Essex believed the debt to be satisfied and the ownership of the Gemstones to rest solely with Essex.

108.   At all relevant times, D&M represented that it was the sole owner of a 100% interest in any gems it offered to Essex as collateral for the First Loan or the Second Loan, including the Gemstones.

109.   At all relevant times, D&M represented to Essex that D&M was the sole owner of 100% interests in each of the Gemstones.

32

110.    At no time prior to the filing by D&M of its petition for Chapter 11 bankruptcy protection did Essex have or receive any evidence or knowledge that SBDC, or any party other than D&M, claimed an interest in any of the Gemstones.

111.    Accordingly, Essex is a buyer in the ordinary course of business of each of the Gemstones.

112.    By reason of the D&M's concealment of the interests in the Gemstones asserted by SBDC, Essex has been exposed to significant potential liabilities arising from the alleged competing claims of ownership being made as to the Gemstones and for which Essex might be held responsible.

113.    Essex is entitled to indemnification from D&M for any liability, judgment, award, or other relief provided to SBDC against Essex in connection with the Gemstones.

114.    Accordingly, an order should issue imposing any attendant liabilities assessed against Essex to be assessed against D&M for being the cause of this prospective liability by means of fraud.

## PRAYER FOR RELIEF

WHEREFORE, the Cross-Claim Plaintiff respectfully prays that this Court enter an order and judgment in its favor and against the Cross-Claim Defendant,

A.    Dismissing the Complaint herein with prejudice;

B.    Ordering D&M to indemnify Essex against any present or future claims asserted by SBDC or other parties in connection with the Gemstones; and

C.    Such other relief as may be just and proper.

Dated: New York, New York
September 16, 2019

Sam P. Israel P.C.

By: _____

Sam P. Israel (SPI0270)
Timothy L. Foster (TF8896)
180 Maiden Lane, 6th Floor
New York, New York 10038
T: (646) 787-9880; F: (646) 787-9886
samisrael@spi-pc.com
timfoster@spi-pc.com
*Attorneys for Defendant/Cross-Claim*
*Plaintiff*